**Pages 1 - 42**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

FORTINET, INC.,                    )
                                   )
          Plaintiff,               )
                                   )
  VS.                              )   **NO. C 20-3343 EMC**
                                   )
FORESCOUT TECHNOLOGIES, INC.,      )
                                   )
          Defendant.               )
_____    )

                         San Francisco, California
                         Thursday, September 17, 2020

          **TRANSCRIPT OF REMOTE VIDEO PROCEEDINGS**

<u>APPEARANCES</u>:

For Plaintiff:
                    SKADDEN, ARPS, SLATE, MEAGHER
                      & FLOM LLP
                    525 University Avenue - Suite 1100
                    Palo Alto, California 94301
               BY:  **JOHN M. NEUKOM, ESQ.**

                    SKADDEN ARPS SLATE MEAGHER
                      & FLOM LLP
                    One Manhattan West
                    New York, New York 10001
               BY:  **DOUGLAS NEMEC, ESQ.**
                    **RACHEL BLITZER, ESQ.**

          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:  Ruth Levine Ekhaus, RDR, FCRR
              Official Reporter, CSR No. 12219

**APPEARANCES**:   (CONTINUED)

For Defendant:

                        WINSTON & STRAWN
                        35 West Wacker Drive
                        Chicago, Illinois 60601
                   BY:  **KIMBALL R. ANDERSON, ESQ.**

                        WINSTON & STRAWN
                        275 Middlefield Road - Suite 205
                        Menlo Park, California 94025
                   BY:  **KATHERINE VIDAL, ESQ.**
                        **MATTHEW MCCULLOUGH, ESQ.**

**Thursday - September 17, 2020**                               **3:33 p.m.**

                         **P R O C E E D I N G S**

                              ---o0o---

        **THE CLERK:**  Court is now in session.  The Honorable Edward M. Chen is presiding.

        Calling Civil Action 20-3343, Fortinet, Inc. versus Forescout Technologies, Inc.

        Counsel, please state your appearances for the record beginning with plaintiff's counsel.

        **MR. NEUKOM:**  Pardon me.  We're the plaintiffs.

        Good afternoon, Your Honor.  This is Jay Neukom on behalf of Fortinet.  With me today are my colleagues Doug Nemec and Rachel Blitzer.  And, if it's okay with the Court, Ms. Blitzer, who is an associate at our firm, will be arguing the pleadings sufficiency issues.

        **THE COURT:**  Excellent.  Thank you.

        **MR. ANDERSON:**  Hello everyone.  It's Kimball Anderson in Chicago.  With me are my colleagues Matthew McCullough and Kathi Vidal.

        And I appreciate the privilege of appearing remotely and pro hac, here from Chicago where the air quality is good today. And my sympathies to all of you in Northern California, where I understand the air quality has been just awful.

        I mentioned Matt McCullough.  He is an associate on our team, Judge.  And I am probably going to -- I'm going to handle

the Section 101 issues.  And to the extent that the Court would like to hear argument on the pleading deficiency, the second half of our motion, the Iqbal Twombly issues, Mr. McCullough is prepared to address these.

THE COURT:  All right.  Well, I would like to focus primarily on the 101 issues, but we can spend some time on the pleading issues as well.  So let's start right in with the 101 question.

You know, I have read the major cases.  You know, obviously familiar with *Alice*, et cetera.  And I think you would agree with me, it's hard to discern the line between what is pannable and what is not.

What's the difference between templates and profiles, and access checkers and access filters, and entry memories and look-up engines, and self-referential tables?

There are a number of factors that I think the Court looks to, but you know, there are fair arguments given that can be made in either direction in any of these cases, it seems to me.

One question that I think we should confront up front -- and I'm hearing some feedback so you should probably mute unless you're going to talk.  We're getting a little bit of an echo there -- is the role of specifications.  You know, if you read *Packet Intelligence*, it strongly suggests, if you look at the claims as a whole, when read in light of the specifications, and you read *Ericcson*, it seems to have a

different emphasis.

And in this case, if we look at the '314, it seems like a key question is:  What are templates and profiles?  What is the specific technological contribution those make here, and how are those different from the way access checker was treated in *DropBox*, for instance?

So I guess my first question is:  What's a template and a profile?

The plaintiff's brief kind of resorts to looking at the some of the embodiments contained at Column 2, also makes reference to different claims, some of the dependent claims.  But are we supposed to look at that?

So let me ask that of the plaintiffs first.  Maybe you can start off by telling me exactly, when I look at Claim 1, what is exactly -- what's a template and what's a profile?

**MR. NEUKOM:**  So can Your Honor your hear me okay?

**THE COURT:**  Yeah.

**MR. NEUKOM:**  Okay.  A couple of thoughts.

Number one, I think we're going headlong into a claim construction issue right at the *Alice* stage, which creates a problem for a court at the Rule 12 stage granting an *Alice* motion.

But, secondly, you're right, we did -- rather than take a claim construction position at the *Alice* stage -- which is possible to do, and I'll explain what I mean by that in a

PROCEEDINGS

minute -- instead, we pointed Your Honor to some of the embodiments in the specification.  For example, the template can be comprised of detecting the IP range of the port on which the servers are provided, location, OUIs whereby the endpoint type is determined.

But my point to you would not be that you should necessarily at this stage of the case make a decision that when Claim 1 talks about a template it necessarily has to mean that recitation of an embodiment from the specification.

What I would say is, you know, you started right where I start and end every *Alice* case, which is any lawyer who tried to tell this Court that they had read the entirety of the *Alice* case law and were able to distill from it consistent principles that apply uniformly throughout all of the federal circuit case law, they are a better lawyer than I am.

But what I see as being -- at least my best attempt at synthesizing the *Alice* case law is to focus on some language from *Alice* and from *Enfish* and a number of other cases, where you read, for Step 1, the claims in light of the specification. And it's almost what I would call a holistic or sort of an earnest exercise to discern the patentees, "their focus," is how the *Enfish* court describes it.  The *Enfish* court also talks about looking at the claims as a whole, to then discern what the *Alice* court would call "what is the patent directed to."

And I think if you -- if you use that, what I am -- and to

be clear, Your Honor, these are my language -- this is my words, God help us, not the federal circuit's.

If we take that sort of holistic or earnest read to a patent, it makes it a little easier to understand why *DropBox* went one way and why *Enfish* went another.

And that is because, as I read the cases and the patents, if you look at *Enfish*, the patentee was focused on a pretty specific computer functionality issue -- right -- for example, problems with the existing relational databases and how they could hack or improve the performance of a computer database or computer database software by using a self-referential model.

In this case, say what you will about the claim language, or comparing it to *Ericcson* or *Prism* or *DropBox*, if you read these patents, it's pretty hard, to me, to read them as being anything other than being directed to a pretty specific -- for each of them it's a different problem -- but pretty specific problems with the performance of or management of or resources required for computer network functionality.

But then -- so let's assume that my restatement of the earnest inquiry into what was the patentee focused on is right, you're not out of the woods yet, as I read and synthesize the case law.

Even if, in reading the specification to inform your reading of the claims, it's evident that the patentee was focused on or the patent claims as a whole are focused on a

problem of computer functionality, the next question becomes, well -- and, again, these are my words -- but did they show some humility in the particular claim language.

So you can write a specification talking about a computer problem, but if you then have these broad generic claim limitations that would take your invention well beyond that realm and into what the federal circuit calls the preemption realm, then you can get yourself into abstraction problems again.

In this case, I think, using the '314 patent as an example, when we look at the claim language, and we look at it for *Alice* purposes to determine the patentee's focus, if not for claim construction purposes, it's clear that these patent -- the patentee on the '314 was focused on solving a pretty particular problem of how to manage privileges across a large diverse user network, and solving it in using claim language which is -- which makes sense in the context of an IP -- IT administrator trying to manage that network.

And we can confirm that that was the patentees' focus -- right -- that they were trying to solve a computer problem, and not trying to preempt or monopolize the broader abstract field by reading how they described it in the specification.

**THE COURT:**  Well, what if the specification, the claim language is written far more broadly than the specification?

**MR. NEUKOM:**  Well, I would say that's not a problem.

And here is what I mean by that.  To use -- to use the *DropBox* as an example -- the *DropBox* case.

In the *DropBox* case the Court's concern was that the access checker was a black box, that while on one hand the claim language talked about an access checker, if you actually read the patent, it was hard to figure out what they were claiming, what would embody it or what wouldn't.  And this is why it is not uncommon at the federal circuit for that court to start asking questions about, why are you starting to get into written description or enablement issues?  I mean, those two issues can collapse into each other.

So, again, if I'm right that the question is what is reading the claims in light of the spec, what was the focus of or the claims, or what are they directed to, it is fair to look at the specification to figure out if there is some focus evidenced by that specification language.

And here, unlike in *DropBox*, we have got numerous instances in the specification of the patentee giving you pretty specific examples of templates and sponsors, and what it means to create a profile, and what kind of criteria are used to create a template or a profile.

Now, again, I do want to be clear because we may be, if we were to survive this motion, we may be before you on claim construction issues in six or eight months.  I'm certainly not taking a position right now that when the claim language

rehearses a template or a profile it means only what is rehearsed in the specification.  But what I am saying is that when you see that level of detail, even in exemplary or embodiment form in the specification, that informs our analysis of what is the focus of the patent.  Right?  Are they trying to solve or hack a particular problem with computer or computer network performance?  Or are they trying to get greedy and claim something much broader and more generic than that?

THE COURT:  So you're saying that if you go beyond the claim language, if you look to the concreteness and specificity of the specifications, there you would draw the line, you would see a distinction between *DropBox* and, let's say, the '314?

MR. NEUKOM:  That's right.

THE COURT:  All right.  Let me -- that's an interesting point.  Let me hear the response.

And I will note that in *DropBox* in discussing the '399 there, the Court does say (reading):

"Nothing in the claims or the specification's definition of the claim elements delineates the session ID or the synchronizer in a manner provided for specific techniques for how to use these to combine the advantages" -- et cetera, et cetera.

So that's at least one instance in which even the *DropBox* court seems to have consulted the specifications, notwithstanding its very strong language that, you know, the

claim language has got to carry within, et cetera, et cetera.

What's your response to that?  Is consulting the specification for purposes of determining the larger question of what is the sort of focus of the invention proper?

**MR. ANDERSON:**  Let me see if I can add some clarity to that, Your Honor, because the issue has come up before.

It's elementary under patent law that limitations cannot be imported into the claim language with specifications.  In other words, if the claim is defective, it cannot be saved by adding or subtracting limitations based on the specification. The proper use of the specification is to explain what a claim term means, but it is not to rehabilitate claim terms that did not survive scrutiny.

And I would go further in this case -- even if you do look at the specifications, and you do look at the dependent claims, you will see nothing more than descriptions of information.

And of course the federal circuit has held repeatedly that the computerization of information does not bring it out of the abstract realm.

So let's take the '314 patent that we have been talking about.  Fortinet has identified as the inventive concept, quote, sponsor profiles and templates and establishing an association between them before granting limited sponsor control.  That's the end of the quote, right out of the brief.

But these profiles, if you look at them, if you look at

the specifications and the -- and the embodiments are nothing more than a set of rules.  The profile is a set of specifications and the templates are sets of rules.

And they are nothing more than intangible information which the federal circuit has said repeatedly, perhaps the clearest statement was in that *SAP America* decision 2018 that we cite.  The federal circuit clearly has held that just managing information doesn't take -- doesn't make the subject matter eligible for patenting.

And so under the two-part *Alice* step, which the Court, you know, knows, is quite familiar with, the first step is looking at the claims to see whether they are claiming an abstract idea.  And the second step is then to look at the claims and, if necessary, to be construed -- to be explained by the specification to see whether they are claiming -- whether there is something non-abstract, or whether there is a non-abstract improvement to the computer itself that takes it out of the abstract realm.

Here there is not.  We can look at the -- we can look at the specifications all day long and there is -- there are no improvements to the computer.  There is no -- there are no computer algorithms like the -- like the *Enfish* case.  There is just nothing.

And I also want to caution against overstating the complexity of the *Alice* analysis.  Some cases it may be -- it

may be harder because the particular technologies that we're looking at are uncharted waters, so to speak.  They are technologies that the federal circuit hasn't looked at yet.  But we don't have that complexity here, Your Honor, because these are by any -- by any fair look, patents that claim access or control over a network.

And we now have three decisions, at least three recent federal circuit decisions holding squarely that network access control patents -- in other words, patents that restrict the access to a network, whether it be a computer network or a communications network, we have three recent decisions -- I'm talking about the *Prism* case, and the *DropBox* case, and the *Ericcson* case -- three decisions holding that that's an abstract idea.  It is not a patent eligible idea.

So this is not one of those cases where you and the federal circuit haven't seen the technology before.  We've got three decisions, almost squarely on point holding that these patents claim ineligible subject matter.

**THE COURT:**  Let me ask you, you now have gone over about three different subjects.

**MR. ANDERSON:**  Okay.  Sure.

**THE COURT:**  Let me go back to your assertion that, if you only -- I think you implied that if the invention only specifies a set of rules, if it only manages information, that's not enough.  And I'm wondering whether that's an

overstatement.  I mean, isn't a self-referential table a way of managing data?  Isn't that a set of rules?  Whether you call it an algorithm or whatever it's really a set of rules.

MR. ANDERSON:  Yes.  But the distinction is that in *Enfish* there was an algorithm that was software that changed the way the computer itself worked.  You won't find anything of that sort in these patents.  There is no algorithm.  There is no software.  There is just no nothing, other than the abstract idea of:  Okay.  We're going to delegate the responsibility for permitting access to the network to someone who has got profiles and templates.

And as the federal circuit has explained, that's no different than regulating access to the floor in your building or, you know, having a bank that loans money based on profiles or security procedures at the airport whereby, if you're a pilot or a flight attendant, then you have a profile where you get one kind of security access versus the others.

That's the distinction, Your Honor.

THE COURT:  Well, that goes to the level of specificity by which one defines what the purpose of the invention is.  And, frankly, there, I'm not sure there is a principal way of discerning -- you could always say:  Well, it's really about access -- it's about security.  It's about access to computers.  And, therefore, that's never a subject matter -- that is an abstract subject matter by definition.

Or you could define it more narrowly and say:  Well, actually we're trying to solve a different problem.  In the context of X, Y, and Z and this kind of network configuration, we did something innovative to ensure proper access to the network by doing X, Y, and Z.

So, frankly, it begs the question -- and I think in the end if one had to, one has to look at the sort of the level of specificity, because that's the flip-side of preemption.

The more broad it is, the less descriptive it is.  The more rooms it eats up, the more abstract and less inventive, it seems to me.  And that's why I focus on, it does seem like the critical concept here is templates and profiles.

And it seems to me Mr. Neukom is saying:  Well, you know, that should await claim construction because, if you look at it in the context of the specifications, there may be some more meat there and perhaps make it look closer to the *Packet Intelligence* situation where there are critical terms there that seem to be enough for the Court, "look-up engine," "parser subsystem," et cetera, as opposed to "access filter" in *DropBox*.

I mean, I could see the argument that you would have to know more about what it is -- perhaps contextualize, as well as maybe claim construction, to understand.

I take it that's your position, Mr. Neukom, that this is a premature stage; it's too early at this point?

**MR. NEUKOM:**  That's right.

And if I may, Your Honor, I have a point of clarification maybe more than advocacy, because I think Your Honor asked both sides one way or another:  How do we -- what is the role of the specification relative to the claim language for the *Alice* inquiry.

And I heard a comment from my learned friend that, at least to my mind, confused the issue.

We need to draw a distinction between Step 1 and Step 2. And as I read the case law, under Step 1, during the abstraction inquiry, where we're trying to figure out what was the focus of the patentee, looking at the specification and, for example, some of the specificity that I have given you as examples on templates and profiles, is absolutely fair game. In fact, it's the proper way to conduct the analysis according to the federal circuit.  By contrast, if, for example, you were to find that Fortinet had failed to persuade you that we passed Step 1, if we lost on Step 1 and we then proceeded to Step 2, if I then tried to save my patents with an inventiveness hook and I did that by pointing you to something really cool and inventive that was in the specification, but I could not then show you that that was also claimed in the claim language, we're not allowed to do that.

So the relevance of the specification beyond the enumerated claims differs between Claim 1 and Claim 2 --

THE COURT:  Well, you said if it's in the specifications but not in the claim language.  Did you mean to say that the claim language is -- I mean, it's rare that you would have a specification that's not included in the claim language.  What's more typical is you have got a specification that is one narrow embodiment and the claim language is 50 times broader than that.

Then, under that circumstance, what role does it play -- does specifications play in Step 2 of *Alice*?

MR. NEUKOM:  I think the -- look, two thoughts.

Number one, the concern that you just raised is exactly why some *Alice* motions may not be decided without a claim construction inquiry, because you may get into a debate about:  If I am pointing you to something in the specification for my inventiveness hook to save myself from an otherwise abstract patent, but I cannot then point you to the claim language or the limitation which covers that supposedly inventive hook, I may or may not be able to do that depending on the claim construction fight.  But in order for me to show you that there is something inventive to save an abstract patent, I have to be able to tie that to something in the claim language.

That -- that law is clear.  But the law is also clear, conversely, that in the Step 1 inquiry -- right -- where we determine what the patenting -- what is the patent as a whole, what is it directed to -- you don't have -- we don't have to

persuade the Court, for example, that every template must be quote, detecting IP range or a port on which services are provided or a location or OUI.

Instead, the inquiry is:  When I read the specification what do I discern about the patentee's focus here?  And one is allowed to look at the specification and spec- -- pardon the alliteration -- specificity within a specification in order to make a call about what the focus of the patentee is without necessarily then taking the next step and saying:  I will resist the abstraction effort specifically because the claim language must mean only the specific embodiment.

THE COURT:  Well, how does that play out?  Let's say I buy your construct.  I look at the specifications without necessarily importing them or using them as claims limitations, but I use them to look at the -- as a whole to kind of focus. And I find in your favor.  I say:  You know, these specifications make it pretty concrete.  It's really not about general delegation, et cetera, et cetera.  It's about using a specific approach.

Then you win Step 1 in *Alice*, you would say; right?

MR. NEUKOM:  That's right.

THE COURT:  And then we would never revisit *Alice* again.

MR. NEUKOM:  Something tells me Mr. Anderson will make sure that we revisit *Alice* again.

THE COURT:  I guess, that's the question.  We never get to Step 2.  We don't defer Step 2.  You just win.

Are you contending that that's it?

You know, you're sort of:  Let's take a preliminary look, holistic look, and once we get over the hump, that's it.  We can't look back again.

MR. NEUKOM:  So, honestly, a part of me, Your Honor, feels like you're asking me a question about waiver or preservation and procedural issues, which I admit I have not thought through in great detail at this stage.

What I intend to be saying at this stage, at the pleading stage, where we credit as true the specification, including, for example, its description of the problem it was trying to solve -- the inventiveness or novelty, if you will, of its proposed act and the benefits thereof -- then in that context, with these patents, including the '314, where the patentee's focus is -- when read in light of spec -- trying to hack a particular problem with the operation or resources or efficiency of something specific to a computer, or in this instance, the computer networking sphere, then, yes.

We -- once you find, if the Court finds, that a fair read of these patents is that the focus of the patentee was not abstract, but rather was solving a problem in the context of the operation and performance of a computer network, then that should be the end of the inquiry.

**THE COURT:** So if, in claim construction, months later, I find that the claim properly construed is much, much broader than the embodiment, much broader than your Column 2 lines 40 through 45 or whatever, there won't -- what's the consequence of that with respect to 101? None?

**MR. NEUKOM:** So I want to choose my words carefully.

I do not have a position of whether, for example -- well, conceptually it would seem to me fair for the Court to reconsider that.

Given that -- as you've heard me say a couple of times with a Cheshire cat grin -- a claim construction dispute can render undecidable or premature an *Alice* challenge.

So if -- let's just take one example that Your Honor has mentioned and so have I, the preemption angle, where certainly there are a line of cases where, even if you had a gorgeous, detailed spec, if the claim language is so broad and so abstract that it seems to be attempting to patent any embodiment of the abstract idea, in that case you've got *Alice* problems. And there are a number of federal circuit cases that hold that.

But, of course, in order to make that determination, you have to have been forming a view of the claims scope. Now, in some cases the claims scope may be so evident or there may not be an issue raised at a Rule 12 *Alice* challenge such that the court doesn't have to concern itself with that.

But in this case, given that, look, whatever my friends and I are debating before you on claim construction issues in six or nine months -- whenever the timing is -- we have got claim language talking about some fairly specific concepts in the computer networking space, of templates and profiles and sponsors.

So we will both do the dance. I'll try to go as broad as I can for infringement and narrow as I can to sidestep the invalidity contentions. But it's hard for me to see there being a debate in which both sides -- or at least certainly not from Fortinet's perspective, the proposed claim constructions are going to be quite specific to the context of the operation and management of a computer network.

THE COURT: So in effect, it seems like you're arguing that since it's 12(b)(6), there is an overlay of Twombly Iqbal and Rule 12 that all facts are construed in favor of the plaintiff, all reasonable construction. And the only question is plausibility, whether there is a plausible case that 101 is met, at least in looking at the specifications, as well as the claims, and perhaps what we know of the field at the time, reading all those facts in your favor, that states a plausible 101 compliance or satisfaction. That's not to say that when we actually get to the nitty-gritty and when we get to claim construction the Court could still say: You know what? I don't think this was directed at just this narrow problem. It

really was directed at a much broader -- the way that it's phrased and an abstract problem, and there was no inventive concept here.

**MR. NEUKOM:**  Two thoughts, Your Honor.

Number one, I think that's absolutely right.

And number two, you know, I talked before about what I read as there is a demand for humility.  That concern is something that Fortinet, like any patentee as a plaintiff will have to keep in mind.

So if I come to you in some number of months and I am proposing massively broad claims scope, I may have to pay the piper on *Alice* grounds.  I don't think you're going to see us do that, but the idea that it could happen and it might be appropriate for you to reconsider the abstraction program, if we get too greedy at claim construction, makes sense to me.

**THE COURT:**  All right.

Mr. Anderson, what about this idea that, at the end of the day, we are at 12(b)(6), it's early, plausibility is all that's needed, et cetera, et cetera.  That's not the end of the game.  Even if they were to survive to make a plausible case of 101, borrowing from the specifications, et cetera, et cetera, that may or may not pan out.

And we haven't done claim construction and this is one of those cases where, maybe, we need claim construction in order to make that assessment.

What's your response to that?

MR. ANDERSON:  Sure.  Well, as Your Honor is aware because you have dismissed cases on 101 grounds on a Rule 12(b)(6) motion, there are cases that are perfectly suited for disposal on 101 grounds on a Rule 12(b)(6) motion.  These are cases that do not have to await claim construction.  So as a legal or procedural matter, you don't have to wait until claim construction.

THE COURT:  Right.

MR. ANDERSON:  Going to the substance.  Here is why you shouldn't:  You know, this whole detour we've been -- that I have been listening to about claim construction, I find very interesting because the plaintiff never argued in its responsive brief that claim construction was necessary.  The plaintiff was asking for a ruling as a matter of law that these patents were not invalid.

And let me tell you -- let me suggest to you, respectfully, why claim construction is not going to advance the ball here.  Mr. Neukom has been talking about looking at the patent as a whole to see what the focus of the patent is.  And he cites the fact that this approach to restricting access to the network using profiles and templates was something that -- that that's the focus, and that's something that's new and novel and inventive.

Well, that is all irrelevant because as Your Honor knows

the federal circuit has held in the *SAP* decision and the *Ericcson* decision that an advancement in the field of an abstract idea, it can be super new.  It can be on -- and I'll just quote from it here.  He's says it can be "groundbreaking, innovative, or brilliant advance in the realm of an abstract idea," but that doesn't make it eligible for patenting.

And what we see in Fortinet's brief is the argument that: Oh, the focus of the patent here is on improving access to the network and the way that it's done is with templates or profiles.

Well, that may be a good idea, but it doesn't take it from the realm of the abstract because, at the end of the day, profiles and templates are just information.  They are not improvements to the computer.  There is no algorithms.  There is no software.  There is no referential tables.  They are just information.

And by the way, the information is processed by generic computer equipment.  There is no specialized hardware.  You won't see anything in the specification.  You won't see any algorithms.  You won't see any flow charts.  There is nothing that reflects an improvement to the computer system itself. All you see is an abstract -- is that the profiles and templates are, themselves, another abstract idea.

And that doesn't take it out of the realm of the abstract under what is now settled authority.  The federal circuit has

now said it several times in the last year or two, that these kind of patents do not survive scrutiny under Step 1 or Step 2.

I would grant you that if they had -- if there is some algorithm in the -- algorithm or self-referential table or some -- you know, some specialized hardware, that is fairly found in the claims -- of course, as I said at the outset you cannot import limitations for the specifications.  But if you can fairly find them in the claims, then these survive.  But there isn't anything -- and nothing has been called to the Court's attention by the plaintiff.  And this plea to punt the -- you know, kick the can down the road, I think, is not well founded.

THE COURT:  Well, I'm familiar with the notion that novelty does not save a patent under 101; in fact, I just held that in the *Polycom* case.  You know, the fact that it was found patentable over 102 challenge was -- did not dispose of the question.

And I also as, you know, I have held several patents invalid under 101 without waiting for claim construction. *Polycom*, again, being one of those because, at the end of the day, rightly or wrongly, I concluded that the gist of the invention was a matter of geometry and not much more than that, and you can't patent geometry.

I have also held that ascertaining demand for a particular product using different method of querying the public was

not -- that was just basic law of Economics 101.  You can't patent that.  So there are just some cases that it seems to me obvious, no matter how you construe it, you're not going to save it.

In this area, it's a little trickier, especially given the overlay, you know, trying to navigate our way between *DropBox* and *Prism* and *Packet Intelligence*.  I mean, even in *Packet Intelligence*, I'm not sure why that was -- I mean why that was uphill.  I don't know.  Maybe I didn't look at the specifications.  I admit, I didn't pull out the pen and look and see what it was in particular that may have saved that.  But, you know, I want you to make a similar argument there -- I don't think there was anything -- no specialized hardware.  I'm not sure if there was an algorithm, some kind of algorithm or not used.

MR. ANDERSON:  I don't want to interrupt you, but there was.  There was an improvement to the functioning of the computer in *Packet Intelligence*.  They had software that identified and refined a -- what they call a "flow of data" so that it could be associated with other data flows and ultimately in an underlying application.

THE COURT:  But how is that not management information?  Isn't that a way of managing information, matching up things?

Was there a unique formula used?  What was the analyzer

subsystem?  Do you have any way to describe what that was, the parser subsystem?

**MR. ANDERSON:**  The federal circuit concluded that was a specific improvement to the computer itself.

And that's what I have been trying to distinguish from these patents.  There isn't any.  All we know is we have profiles and templates.  It's like a library card, or your TSA pass, or building pass.  You have a profile that allows you to get or in or out, and that is what the federal circuit has told us repeatedly is just access control.  That's just an abstract idea.  You cannot take it out of the abstract realm with just another abstract idea.

And so I'm sounding like a broken record, but I'm also resting comfortably on a trio of federal circuit cases that have looked at this exact type of claim.

And I want to get back to a point.  But you can -- we can look at the specification -- the role of the specification I think is clear:  You cannot import limitations, but you can look to see whether it informed on the meaning of a claim limitation.

And there is nothing in this specification, in any of the three patents, that reflects an improvement to the computer itself.  They just -- they are more abstract ideas about managing information with generic computer hardware.

**THE COURT:**  All right.  Well, I'm going to take this

under submission.  I mean, we could probably get into the specifics of the other two patents as well.  I could ask a lot of questions about what the heck is a network access filter as part of the NACS, and where is it defined; but I have a feeling we're going to end up in the same place.  I know your respective positions.  I'll take it under submission.

I will say this much that, you know, I view these things with some skepticism, especially when you look at the claim language itself, when these terms aren't well defined it's -- it's hard to discern exactly what you can say the focus is and what the inventive concept is.  On the other hand, you know, the case law is mixed.  And you could say that about some of these other areas where the Court has upheld things if it's not necessarily self-evident.

So I feel the twang of *DropBox*.  I asked myself the question:  Well, how, how does it do -- how do you do it?

And yet other cases don't seem to just focus on the "how." So I have to say it's not particularly clear.  But I do think that I have to think twice, since this is a 12(b)(6).

This one is not so blatantly obvious where the patent really turns on simple geometry or a simple rule of economics or some other thing that's fundamentally obvious, and can't be saved, conceivably, by any claim construction.  It's not crystal clear to me here that claim construction would be irrelevant.

And the question of inventiveness and whether something -- what was applied was routine and well known, et cetera, can raise questions of fact at some point.  And I'm little leery about reaching an ultimate conclusion on this question without necessarily hearing more.  But I will look at it and give that some more thought.  So it's been helpful to hear counsel on this.

Let me just give you briefly, since you have other counsel and associates willing and able to address the pleading questions, I want to hear a little something about that and give everybody a chance to say something.

I guess I would like to hear from defendants, in terms of the indirect infringement, what the strongest argument why there is neither inducement or contributory infringement here.  And then I would like to hear the plaintiff's response to that.

**MR. McCULLOUGH:**  Yes, Your Honor.  I can address that.

So for indirect infringement either inducement or contributory infringement, under the case law, the plaintiff has to allege facts that would support that the plaintiff -- or the defendant knew the products were infringing.  And that is a requirement that there are simply no facts in the complaint that would support that allegation.  There are no facts that would support that the defendant had intent to encourage infringement.  There are no facts for contributory infringement that the products lack substantial non-infringing uses.

The only thing present in the complaint are the ultimate conclusions.  And those are pure legal conclusions that are entitled to no deference by the Court under the Rule 12(b)(6) standard.  And consistent with the case law from this Court in the *Google* case, those types of threadbare allegations that do nothing more than state the ultimate legal test, fail to state a plausible claim for indirect infringement.

THE COURT:  Well, for inducement you need specific intent, right?  So that's clear.  So just as you said, you have to have not only knowledge of the patent, but knowing that the induced acts constitutes infringement.

MR. McCULLOUGH:  Correct.

THE COURT:  But for contributory negligence, one way to get there is showing there is no substantial non-infringing use -- right -- of the accused device?

MR. McCULLOUGH:  No, I don't think that's quite right, Your Honor.  The test is that you have to show both that the defendant had knowledge that the product was specially made or specially adapted for infringement, and that the product does not have substantial non-infringing uses.

So I think both of those are required.  And the specially made or adapted for infringement standard is very similar to the knowledge that the product or the act constitutes infringement that is required to show induced infringement.

THE COURT:  So knowledge of the no substantial

non-infringing use is required, not just the fact of no substantial non-infringing use?

MR. McCULLOUGH: For contributory infringement the knowledge that is required is knowledge that the product is or the method is specially made or specially adapted for infringement.

THE COURT: All right.

MR. McCULLOUGH: That's one requirement. And then the second requirement is that the product or method itself lacks substantial non-infringing uses.

THE COURT: Okay. So both knowledge and fact of -- or knowledge of special -- that this was made specially. Okay.

What's the response? The allegations here are broad, seem conclusory, and we've got specificity requirements under Twombly and Iqbal, as well as the sort of high level of specific intent required for contributory infringement.

MS. BLITZER: Thank you.

So the first issue that Mr. McCullough raises is the issue of knowledge, both knowledge of the patent and knowledge of the infringement. We can dispose of that pretty quickly. That was addressed in paragraphs 41, 55, and 69 of our complaint in which we allege that by, at least, the filing of this complaint Fortinet disclosed the existence of the patents and disclosed the infringement. So that's an easy one.

Their reference that based on this disclosure -- this

disclosure being the complaint itself -- Forescout has knowledge of the '314 patent, and has knowledge, as well, of other two patents and knowledge that its activity infringed those patents.  So that disposes of the knowledge elements rather easily.

**THE COURT:**  Let me ask you about that.  What if a complaint is filed, but the alleged infringer truly believes that the complaint is frivolous; that, for instance, this is facially a 101 problem and it's never going to fly, et cetera, et cetera.  Does that come into play?

Or you just have to have knowledge that it's being asserted as an infringement or do you have to have knowledge of the likelihood of risk of infringement?

**MS. BLITZER:**  I believe you have to have likely knowledge of a substantial risk of infringement.  So what you were talking about can relate a great deal to willfulness in that, if an accused infringer has the genuine belief that they don't infringe a patent, that can be persuasive on the willfulness front.

But, at least at the pleadings stage, for an allegation of indirect infringement, it's enough to plead that the accused infringer has both knowledge of the patent and knowledge of the infringement.  Whether that proved to be true at the end of the case, when we have a complete record, is a different matter.  But at the pleading stage, it's enough to make that allegation.

THE COURT:  But, you say it has to be at least enough knowledge that there is a substantial risk of infringement?

MS. BLITZER:  For the ultimate conclusion of indirect infringement.

THE COURT:  Yeah.  Okay.

MS. BLITZER:  At the end of the case.

THE COURT:  Is that substantial, that quantification there, what's the best case -- is there a case that sets forth the standard of risk that one has to be aware of?

MS. BLITZER:  Well, the cases -- at this stage of the case?  At the pleadings stage?

THE COURT:  Yeah.

MS. BLITZER:  Sure.  Let's see.  At this point you can look to your own case, to *Google*.  But we can also look at some other cases in the district, *Synopsys v. Atop Tech* and *First Base v. Apple*.

THE COURT:  Okay.  That's enough.  That's fine.  Thank you.  I appreciate that.

MS. BLITZER:  But, you'll see from those cases that the standard at the pleading stage is really rather quite low. It's just that the complaint must allege that the accused infringer had knowledge of the patent and knew that its activities infringed that patent; which we have alleged and we have alleged it as of the filing of the complaint, based on the complaint.  So there is -- there should be no question of

knowledge element at that point.

And Your Honor and others in the district have distinguished between post-suit allegations of indirect infringement versus pre-suit allegations of indirect infringement.

You have looked at that specifically in *Software Research v. Dynatrace*.  That was also visited in *Windy City Innovations v. Microsoft*.

**THE COURT:**  What about the question on contributory negligence, knowledge that this was specially made, adapted for use, and no substantial non-infringing -- what can you point to in terms of specificity of your allegations here?

**MS. BLITZER:**  Sure.  This is an issue that you had explored in the *Google* case, which has been cited in the briefing and relied on heavily by Forescout.

Forescout relies on *Google* for the notion that Fortinet only makes passing references to Forescout manuals, which is not enough for specific intent.  But here, Fortinet didn't just make passing references to the technical documentation that's provided by Forescout on, for example, its resource page.  That same document is actually cited as the basis for our direct infringement allegations.  So that means it's cited in paragraph 45, 59, and 73.  Each of those paragraphs identify a different set of Forescout materials that evidence the direct infringement.  So this is a little different than some of the

other cases.

It's not a situation in which the complaint simply generically cites thousands of pages of manuals as the -- as only support for the notion that the defendant instructed others. But, instead, this is a case where actually the evidence of direct infringement and the basis for Fortinet's claims comes directly from those instructional materials. So it's not just that Fortinet has looked at the accused product, says it infringes, and then points to some Forescout materials that instruct how to use that product. No. Here the instructions themselves are the basis for our direct infringement allegations. Everything comes from those instructions.

So here things are a little different than in *Google*. In *Google* Your Honor had explained that the plaintiffs' complaint was sufficient because, one -- I'm sorry. You said that the complaint is insufficient there, first, because it did not point to specific instructional materials as examples and, second, because they did not ever say what those instructions contain.

Here Fortinet actually pointed to specific different instructional materials for each patent and explained that they -- those materials themselves formed the basis to the direct infringement allegations and they describe the infringement. And, again, I said that we did that in

paragraphs 45, 59, and 73.

THE COURT:  All right.  Let me take a look.  45?

MS. BLITZER:  Yes.

THE COURT:  And what there -- as an example of that, how does that bear on infringement?  I did not hyperlink to that, but there is a reference to it.  But do you know offhand what it was?  You say exemplary materials --

MS. BLITZER:  So in paragraph 45 there are two documents linked.  One is the administration guide for the accused CounterACT product and one is a how-to guide.  The administration guide is about -- is a very long document, and the operator's guide is a shorter one.

But unlike some other cases, where instructional materials are only relied on for specific intent and for contributory infringement, here the instructions given by Forescout are the entire basis of the direct infringement complaint.

So given that it's clear, then, from those materials that, at least in our view, as we have pled in our complaint, that those materials completely instruct how to perform the invention.  So they are not -- there is no question in our mind and in our pleading that those materials are incomplete in some way, or that those materials only hint at what to do.  Those materials actually describe our entire case of direct infringement, which is different than the case in *Google*.

THE COURT:  All right.  Let me ask you to respond,

Mr. McCullough, on that last point, on the specificity and the completeness of these instructions that show encouragement of direct infringement.

**MR. McCULLOUGH:**  So, Your Honor, what's cited in paragraph 45 are two product manuals that Forescout has created.  One is 788 pages long.  The other is 43 pages long.  There is no identification in the complaint of any specific features within those documents that are allegedly relevant to infringement.  There is no description of, you know, which pages of the document you should look at.  There is simply no specificity explaining how these materials allegedly tie into the claims.

And so it doesn't provide notice of any infringement theory.  And, in fact, if you look back at the paragraph right before this, paragraph 44, what Forescout -- or what Fortinet states about their infringement theory, for example, the second sentence of that is (reading):

"The network administrator creates templates and profiles that associate network users with a sponsor in controlling the use of network resources."

This doesn't tell you anything about the defendant's product.  That just reorganizes some of the words of the claim, some of the words the Court has already discussed today, templates and profiles.  But, it doesn't provide any notice of a theory.  That sort of parroting the claim language doesn't

provide notice, doesn't state a plausible claim, and cannot be the bases for a specific intent to induce infringement because there is nothing specific about that allegation or the allegation in paragraph 45.

THE COURT:  Do the two documents cited in paragraph 45 then go on to describe the creation of templates and profiles?

MR. McCULLOUGH:  I don't believe -- so, there were some references to the word "template."  There are no references to the word "profile," at least in one of the two documents.  Those are not words that -- you know, and the references to "templates" I don't think are used in the same context that the patent is using them.  So there is nothing in the documents themselves that would tell us how to map these elements to the claim to understand what the infringement is, the infringement allegation is.

THE COURT:  We almost need an infringement contention chart with respect to these two documents, I suppose.

MR. McCULLOUGH:  We're not demeaning the infringement contentions.  You know, I think the case law is clear that you don't have to get to that level of specificity, but you have to do more than just parrot the claim language and say:  Go look at these 800 pages of guides and figure it out yourselves.  That's not enough.

And particularly when they are only alleging an indirect infringement case for which they have to show for inducement

PROCEEDINGS

that we had specific intent, and for contributory that we knew they products were specially made or specially adapted for infringement, this is not enough.  This doesn't provide Forescout --

THE COURT:  Right.

Let me ask you, Ms. Blitzer, if required, I take it you would be able to be more specific, rather than just hyperlinking to two documents to actually quote and cite to specific provisions that you claim make the direct infringement obvious?

MS. BLITZER:  Well, Your Honor, we have already been more specific.  Prior to this hearing, back in August we served our infringement contentions on Forescout.  Those contentions were nearly 600 pages in length.  So Forescout already has that.

And, from a review of those materials, they should know that in the very document that Mr. McCullough was discussing there is a great deal of discussion about the exact terms that we have been discussing.  "Templates" are used.  "Sponsors" are used.  "Network administrator" is used.  So this isn't really just a parroting of the claim language here.  These terms are actually used in that document which is Forescout's own document.

THE COURT:  All right.  Let me ask Mr. McCullough this last question.

So what about, at least as of the point of the serving of the infringement contentions, why isn't that enough at that point to trigger the kind of knowledge that is asserted here?

MR. McCULLOUGH:  A couple of responses.

First under Rule 12, the rule is --

THE COURT:  I'm having trouble hearing you.  You're fading out suddenly.

MR. McCULLOUGH:  A couple of responses.

First under Rule 12, you can't look to materials outside of the complaint.

Can you hear me, Your Honor?

THE COURT:  Barely.  You were fine.  And now your audio almost cut out.  I can sort of hear you.  Rule 12, confined to the complaint.

MR. McCULLOUGH:  Yes.  The second issue, Your Honor, is they can't make this sort of allegation and say:  Just because we served you with a complaint or just because we served you with infringement contentions, we get to allege indirect infringement.

That's not consistent with the case law and it's not consistent with Your Honor's own decision in *Google*.  The allegation there was knowledge based on the date of the complaint.  And the Court said that's insufficient to allege specific intent and I'm dismissing the claim.

You can't have this sort of circular argument that just

because I have alleged it, I now get to allege indirect infringement.  That's not enough under the case law.

And the third response I have is that it matters here, the complaint matters here because the complaint currently alleges infringement based on the date of the complaint itself.  But, if they are now relying on the infringement contentions, then the date which matters for damages, which matters potentially for willfulness, that all has to shift back.  And so the complaint itself would need to be updated to reflect that they can't, sort of, you know, retroactively take the infringement contentions and date them back to the date of the complaint.

THE COURT:  All right.  I will take all these matters under submission, including the pleading questions.

And I appreciate counsel's help.

MR. NEUKOM:  Thank you, Your Honor.

THE COURT:  So you'll hear from me at some point.  I don't know --

Angie, do we have -- what's our next?  Do we have a CMC or something?  Do we have other dates in this matter?  Do we have claim construction set?  We do; right?

I can't hear you, Angie.

THE CLERK:  Yes, Your Honor.  We do.  March 2nd is the claims construction date.

THE COURT:  All right.  I think that's fine.  If there is something that we need to talk about before then, we can do

that.

THE CLERK:  There is also a status conference on October 15th.

THE COURT:  Oh.  Okay.  All right.  Well, that gives me a target date to get out a ruling.

So we'll see you in October then.  Okay?

MR. NEUKOM:  Thank you, Your Honor.

MR. ANDERSON:  Thank you, Your Honor.

THE COURT:  Thank you everyone.  Very helpful.  Thank you.

THE CLERK:  Court is adjourned.

(Proceedings adjourned at 3:33 p.m.)

---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Friday, September 25, 2020

_____

Ruth Levine Ekhaus, RDR, FCRR, CSR No. 12219
Official Reporter, U.S. District Court