JOHN M. NEUKOM (SBN 275887)
DEBEVOISE & PLIMPTON LLP
650 California Street
San Francisco, California 94108
Telephone:    (415) 738-5700
jneukom@debevoise.com

JAMES Y. PAK (SBN 304563)
SKADDEN, ARPS,
   SLATE, MEAGHER & FLOM LLP
525 University Avenue
Palo Alto, California  94301
Telephone:    (650) 470-4500
james.pak@skadden.com

DOUGLAS R. NEMEC (*pro hac vice*)
LESLIE A. DEMERS (*pro hac vice*)
ANTHONY P. BIONDO (*pro hac vice*)
SKADDEN, ARPS,
   SLATE, MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Telephone:    (212) 735-3000
douglas.nemec@skadden.com
leslie.demers@skadden.com
anthony.biondo@skadden.com

*Attorneys for Plaintiff,*
*Fortinet, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| FORTINET, INC.,<br><br>                Plaintiff,<br><br>        vs.<br><br>FORESCOUT TECHNOLOGIES, INC.<br><br>                Defendant. | Case No. 3:20-cv-03343-EMC<br><br>**PLAINTIFF FORTINET, INC.'S OPPOSITION TO FORESCOUT'S MOTION TO EXCLUDE EXPERT OPINION TESTIMONY OF DR. TAL LAVIAN**<br><br>Date:      October 3, 2024<br>Time:     1:30 p.m.<br>Place:    Courthouse 5, 17th Floor<br>              San Francisco<br><br>Hon. Edward M. Chen |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

I.  INTRODUCTION ................................................................................................1

II. FACTUAL BACKGROUND ...............................................................................2

    A.  Opinions on '299 Patent ............................................................................3

        1.  The Court's Claim Construction ...................................................3

        2.  Dr. Lavian's Infringement Analysis .............................................4

        3.  Dr. Lavian's Analysis of Patent Validity ......................................5

    B.  Opinions on the Contributions of the Fortinet Patents to CounterACT .................7

    C.  Opinions in Response to Dr. Cole's Apportionment for the Forescout Patents ......8

    D.  Opinions on Alternative NAC Products .............................................10

III. LEGAL STANDARD ..........................................................................................11

IV. ARGUMENT .....................................................................................................11

    A.  Dr. Lavian expressly applied the Court's construction of "RAD-agnostic." ..........11

    B.  Dr. Lavian's opinions on the contribution of Fortinet's patents to CounterACT are the product of reliable methods. .......................................................15

    C.  Dr. Lavian's response to Dr. Cole's arbitrary apportionment calculation is the product of his application of reliable methods. ....................................18

    D.  Dr. Lavian's opinions that other NAC products exist and could serve as acceptable alternatives are the product of reliable methods. ................................19

V.  CONCLUSION ..................................................................................................21

# <u>TABLE OF AUTHORITIES</u>

## CASES

*Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.*,
    738 F.3d 960 (9th Cir. 2013) ............................................. 11

*Elkins v. Pelayo*,
    No. 1:13-CV-1483, 2022 U.S. Dist. LEXIS 69648, (E.D. Cal. Apr. 14, 2022) ................................ 20

*Chavez v. S.F. Bay Area Rapid Transit District*,
    No. C 22-06119, 2024 U.S. Dist. LEXIS 110219 (N.D. Cal. June 21, 2024) ...................... 11

*Chimie v. PPG Industries Inc.*,
    402 F.3d 1371 (Fed. Cir. 2005)........................................................ 14

*Innovative Memory Systems, Inc. v. Micron Technology, Inc.*,
    No. CV 14-1480, 2022 WL 4548644 (D. Del. Sept. 29, 2022) ........................... 17

*Messick v. Novartis Pharmaceuticals Corp.*,
    747 F.3d 1193 (9th Cir. 2014) ............................................. 11

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*,
    575 F.2d 1152 (6th Cir. 1978) ............................................. 20

*Plush Lounge Las Vegas LLC v. Hotspur Resorts Nevada Inc.*,
    371 F. App'x 719 (9th Cir. 2010)........................................ 17

*Primiano v. Cook*,
    598 F.3d 558 (9th Cir. 2010) ............................................. 11

*Snyder v. Bank of America, N.A.*,
    No. 15-cv-04228, 2020 WL 6462400 (N.D. Cal. Nov. 3, 2020) ................... 21

*Summit 6, LLC v. Samsung Electronics Co.*,
    802 F.3d 1283, 1296 (Fed. Cir. 2015)........................................ 19

*Treehouse Avatar LLC v. Valve Corp.*,
    54 F.4th 709 (Fed. Cir. 2022) ............................................. 12

*Zhu v. Li*,
    No. 19-CV-02534, 2023 WL 1111507 (N.D. Cal. Jan. 30, 2023)....................... 17

Plaintiff Fortinet, Inc. ("Fortinet") hereby submits this opposition to Defendant Forescout Technologies, Inc.'s ("Forescout's") Motion to Exclude the Expert Opinion Testimony of Dr. Tal Lavian (Dkt. 280) ("Motion" or "Mot.").

## I. __INTRODUCTION__

Forescout raises four attempts to smear Dr. Lavian, each based upon a distorted reading of his deposition testimony and report. The first of these is nothing more than a claim construction re-argument disguised as a *Daubert* challenge. As to the remaining three, rather than seriously engage with the reasoning in his report, Forescout plucks individual statements out of context, and questions them as if they were the entirety of his opinion. The record shows that Dr. Lavian's opinions are the subject of methodical and reliable analyses, and Forescout does nothing more than dispute the conclusions—which its briefing shows it is amply prepared to test at trial through cross-examination.

First, Forescout misconstrues Dr. Lavian's report to suggest that he is applying a different construction of "RAD-agnostic," taking out of context language he recited from the Court's own order and spinning it as an admission. In reality, he expressly and rigorously applied the Court's construction. (*See* Nemec Dec. Ex. 1,[1] Lavian Infringement Rep. ¶¶ 139-145.) Forescout's argument is a veiled request for reconsideration of this Court's construction, one that comes years too late and asks the Court to impose an extreme view of the claims that would be at odds with every embodiment of the patent and render implementation of the invention a practical impossibility. Second, Forescout takes quotes from Dr. Lavian's deposition out of context to wrongly suggest that he did not consider components of the accused product, CounterACT, in his opinions as to the value contribution of the patents. In reality, his report addresses every single component of CounterACT, including the ones Forescout takes issue with, and his ultimate value apportionment is based upon every functional component of the accused products. (*See* Ex. 1, Lavian Infringement Rep. ¶ 339-344). Third, Forescout argues that Dr. Lavian "has no methodology" in his response to the arbitrary apportionment analysis by Forescout's expert, Dr. Cole, because Dr. Lavian allegedly does not provide absolute mathematical certainty. In reality, the evidence shows that Dr. Lavian's

---

[1] Hereafter all exhibits to the Declaration of Douglas R. Nemec filed concurrently will be cited as "Ex. [number] . . . ."

apportionment response includes detailed reasoning for his choices and is based upon several of Forescout's own assumptions. Forescout ignores his actual analysis in favor of highlighting the possibility of a plus or minus one percentage point window of error. <u>Finally</u>, Forescout argues that Dr. Lavian's opinions that other NAC products exist and could serve as alternatives is unreliable because he did not perform a detailed infringement analysis of third-party products in the market. In reality, he opined on the scope of the available products on the market, based upon statements from Forescout's own expert, as it is not seriously disputed that there are many competitors in the NAC space, which is more than sufficient to provide the context for a hypothetical negotiation.

None of Forescout's arguments come close to meeting the bar for exclusion of expert testimony pursuant to *Daubert*; therefore, the motion should be denied in all respects.

## II.   <u>FACTUAL BACKGROUND</u>

Fortinet brought this action on March 15, 2020, alleging patent infringement, and amended its complaint on December 2, 2020. (Dkts. 1, 67.) Fortinet asserted that Forescout's CounterACT product, later referred to as the Forescout Platform, infringed its patents. (*Id.*) Forescout filed its answer and counterclaims on July 6, 2021, asserting infringement of its own patents against Fortinet's competing product, FortiNAC. (Dkt. 107.)

The parties served their experts' opening reports on March 11, 2024, and rebuttal reports on April 19, 2024. (Ex. 1, Lavian Infringement Rep., Ex. 2, Ugone Rep.). Of note for this motion are the opinions of Fortinet's technical and damages experts, and Forescout's technical experts. In his opening report on infringement, Fortinet's technical expert, Dr. Tal Lavian, opined that CounterACT infringed Fortinet's presently asserted patents and also offered opinions as to, *inter alia*, the contribution of the patents to CounterACT. (Ex. 1, Lavian Infringement Rep. ¶¶ 106-349.) Fortinet's damages expert, Dr. Keith Ugone relied upon these opinions in his damages report. (Ex. 2, Ugone Rep.) Forescout's technical expert on its patents, Dr. Eric Cole, opined that Fortinet's FortiNAC product infringed Forescout's patents and also offered opinions as to apportionment and customer demand. (Ex. 3, Cole Rep.) Forescout's technical expert on Fortinet's patents, Dr. Seth Nielson, opined that Fortinet's patents were invalid. (Ex 6, Nielson Rep.)

In his rebuttal report on non-infringement, Dr. Lavian responded to, among other things, Dr. Cole's apportionment analysis for the Forescout patents. (Ex. 4, Lavian Rebuttal Rep. to Cole ¶¶ 63-70). In his rebuttal report on invalidity, Dr. Lavian responded to Dr. Nielson's arguments regarding validity of the Fortinet patents. (Ex. 5, Lavian Rebuttal Rep. to Nielson ¶¶ 59, 61, 177-179).

## A. Opinions on '299 Patent

In his infringement report, Dr. Lavian offers opinions as to several asserted patents, but relevant for this motion is his opinion that CounterACT infringes U.S. Pat. No. 9,369,299 (the '299 Patent). In comparing the asserted '299 Patent claims to CounterACT, Dr. Lavian applied the Court's construction of the term "said system is RAD-agnostic" which is that "said system is unaffected by the manufacturer of the RAD." (Ex. 1, Lavian Infringement Rep. ¶ 27).

### 1. The Court's Claim Construction

At the claim construction phase, the Court construed the term "said system is RAD-agnostic," which appears in Independent Claims 1 and 11. (Dkt. 174 (Claim Construction Order) at 44-45). These two claims recite, in relevant part:

> … wherein said enforcement is out of band and is accomplished on said RAD, comprising communicating with said RAD to make real-time changes to its running configuration, whereby said enforcement is vendor-independent and said system is RAD-agnostic…

'299 Pat. at Claim 1, 11. The Court ruled:

> A patentee may act as his or her own lexicographer if the patentee "clearly set[s] forth a definition of the disputed claim term," and "clearly express[es] an intent to define the term." *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) (quotation omitted). The patentee's lexicography must appear "with reasonable clarity, deliberateness, and precision." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998).
>
> In the '299 [P]atent, the patentee expressly defined "(vendor)-agnostic" as follows:
>
> > Terms used in this application are described below.
> > …
> > (vendor)-agnostic—The state of being unaffected by the manufacturer of network devices being managed in the network.
>
> ('299 patent, 4:40–51.) The parenthesis around "vendor" suggests that this definition must cover more than "vendor-agnostic." Besides the definition of "(vendor)-

agnostic," the specification only mentions "agnostic" three times: one "vendor-agnostic" (*id.* at 5:54), and two "RAD agnostic" (*id.* at 2:41, 4:36). Therefore, the definition of "(vendor)-agnostic" must relate to "RAD agnostic." In this regard, neither party advocates the swapping out "vendor" with "RAD," *i.e.,* "the state of being unaffected by RAD," presumably because NACS interacts with RAD and thus must be affected. Instead, both parties' proposed constructions of "RAD agnostic" involve RAD manufacturers. It is therefore obvious that what the system is agnostic about must be of RAD manufacturers. The Court therefore construes "said system is RAD-agnostic" as "said system is unaffected by the manufacturer of RAD."

The Court's construction addresses the parties' concerns with each other's construction. Unlike Forescout's proposal, the Court's construction is grammatically correct. It is consistent with the specification's characterization of a RAD-agnostic embodiment as a "multi-vendor solution." (*Id.* at 4:36.) It derives from patentee's express definition of "(vendor)-agnostic" and is therefore consistent with Forescout's authority that "a patentee-specified definition controls." (Forescout Resp. at 17 (citing *3M Innovative Props. Co. v. Avery Dennis Corp.*, 350 F.3d 1365, 1371 (Fed. Cir. 2003)).) It further avoids using "multi-vendor" which Forescout argues to be indefinite. (Forescout Sur-reply at 11.)

(Dkt. 274 at 44-45.)

## 2. Dr. Lavian's Infringement Analysis

Dr. Lavian applied the Court's construction in his infringement report, opining that Forescout's CounterACT was RAD-agnostic. In his report, he explained, in relevant part:

I understand that the system being RAD-agnostic means that said system is unaffected by the manufacturer of RAD, and that the enforcement (i.e., the enforcement of usage policy) must be vendor-agnostic. The manufacturer of the RAD refers to its vendor, I am not aware of any sensible difference between the two words in this context, and the patent seems to use the two interchangeably. *See, e.g.*, '299 Pat. at 4:49-51 (referring to vendor-agnostic as not being affected by the manufacturer of the network device).

The act of enforcement of policy by the CounterACT appliance is achieved independent from the vendor, with the system being unaffected by the manufacturer of the rad. As the '299 Patent explains, "[e]mbodiments of the remote access solution are designed to work with many different remote access devices and types" and "[t]he methods employed to affect network restrictions through the use of filters are abstracted such that most types of filtering mechanisms supported on devices can be leveraged." '299 Patent at 5:54-59. CounterACT's plugin provides both of these features: support for many different remote access devices and types, and abstraction to transparently hide the peculiarities of any specific type of RAD, together allowing the device to operate unaffected by the manufacturer of RAD.

First, as noted above, the VPN Concentrator Plugin supports a variety of RADs from a multiple manufacturers or vendors, including Cisco and Juniper.

Second, the policy functionality breaks this down into a single "VPN Block" action that may be added to any policy enforced by the CounterACT appliance, and unifies the format of information about the VPN-connected users regardless of whether a network has multiple VPN concentrators from multiple vendors, and regardless of which VPN concentrator a given user or device is connected to.

As the manual explains, the VPN block action prevents a user from connecting via a VPN. I note that this is a single action, and not one limited to a single VPN concentrator or vendor. The underlying functionality and peculiarities of a specific vendor's RAD implementation are abstracted away from the policy, allowing a single policy to work with multiple disparate VPN concentrators from multiple vendors.

Similarly, it explains that the CounterACT appliance collects information about devices connected to the network, and that for VPN-connected hosts, it collects additional information from the VPN concentrator in a way that is transparent to the policy functionality, again allowing a single policy to draw from multiple VPN concentrators unaffected by the manufacturer of the VPN concentrator itself.

This is in contrast to, *e.g.,* using a hard-set policy command to send a predetermined communication to a single VPN concentrator from a single vendor. The vendor-independent and RAD-agnostic nature of the CounterACT system allows policy authors to pull data from VPN concentrators and apply actions to VPN concentrators with no knowledge of the underlying VPN concentrators that are used. Moreover, if a VPN concentrator is replaced – say, replacing an aging Cisco VPN3000 system with a newer Cisco ASA VPN – any policies that use VPN-related host information or apply VPN actions like the VPN Block action need not be updated.

(Ex. 1, Lavian Infringement Rep. ¶¶ 139-145 (images omitted); *see also id.* at ¶ 27).

### 3.    Dr. Lavian's Analysis of Patent Validity

In his rebuttal opinion on patent validity, Dr. Lavian responded to Dr. Nielson's arguments that a RAD-agnostic system must support every possible RAD.  (*See* Ex 6, Nielson Rep. ¶ 1063 (claims "broadly apply to all possible RADs").)  Dr. Lavian explained, in various sections:

In my reports, I take a more nuanced stance on the phrase, as it is my opinion based upon the Court's construction order and the patent's disclosure that it requires only that the system be unaffected by the manufacturer of the RAD, a construction consistent with a multi-vendor solution. *See* ECF No. 174 at 45; *infra* at § VII. A.

*       *       *

Instead, it is my opinion that RAD-agnostic need not be interpreted to either extreme, and I reject Dr. Nielson's insinuation that failing to adopt his reduction of the phrase would require rendering it meaningless. As I describe later in this report, the abstraction described by the patent provides this RAD-agnosticism, allowing for a system to support multiple mechanisms to apply to VPN concentrators from multiple manufacturers. *See,* § VII.A, *infra.* This provides, *e.g.,* the flexibility for one system with one policy to be applied to multiple differing VPN concentrators. *See also* Lavian Opening Rep. on Infringement ¶¶ 140-145. This is consistent with the Court's ruling at claim construction, and the understanding of a POSITA.

\*       \*       \*

Indeed, the Court's construction of the term reflects this, with the Court holding that a system is RAD-agnostic when "said system is unaffected by the manufacturer of RAD," and also holding that the system in Claim 11 refers to the NACS. ECF No. 174 at 42-43. The Court, in its ruling noted that this construction is consistent with the language in the patent noting that the system is "a multi-vendor solution," and derives from a definition in the specification for the related phrase "(vendor)-agnostic," noting that the parties agreed on the system being agnostic to the vendor or manufacturer of the RAD, rather than anything else about the RAD:

> The Court's construction addresses the parties' concerns with each other's construction. Unlike Forescout's proposal, the Court's construction is grammatically correct. **It is consistent with the specification's characterization of a RAD-agnostic embodiment as a "multi-vendor solution." (Id. at 4:36.)** It derives from patentee's express definition of "(vendor)-agnostic" and is therefore consistent with Forescout's authority that "a patentee-specified definition controls." (Forescout Resp. at 17 (citing 3M Innovative Props. Co. v. Avery Dennis Corp., 350 F.3d 1365, 1371 (Fed. Cir. 2003)).) It further avoids using "multi-vendor" which Forescout argues to be indefinite. (Forescout Sur-reply at 11.). ECF No. 174 at 45.

It is unclear how a POSITA could take away from this the idea that the system must support every existent and conceivable RAD. Indeed, as Dr. Nielson himself notes, the specification reports that the system is "designed to work with many different [RADs] and types," supports "most" types of filtering mechanisms on these devices, and that the invention generally "has something to do with supporting multiple vendors." Nielson Rep. ¶¶ 1037-38. Nothing he identifies suggests that the NACS must support *every* RAD from *every* vendor. He then, nonetheless, goes on to look for a "one-size-fits-all" solution, proposing that a POSITA test "every possible type of RAD" from "every possible vendor" and build a solution that "[works] with all RADs." *Id.* at ¶ 1038. It is unsurprising that he did not find one after subtly moving the goalposts out of the stadium and deep into the parking lot.

Instead, A POSITA would take away from the Court's construction that, of course, the system must not be affected by the manufacturer of the RAD – *i.e.,* it supports

RADs from multiple vendors, and does it in a way such that the system as a whole is not affected by the manufacturer of a given RAD. It proposes that the system be made agnostic to the vendor of the RAD by taking the differing mechanisms of affecting network restrictions supported by different RADs and abstracting them away:

> As mentioned, the NACS is vendor-agnostic. Embodiments of the remote access solution are designed to work with many different remote access devices and types. The methods employed to affect network restrictions through the use of filters are abstracted such that most types of filtering mechanisms supported on devices can be leveraged. '299 Patent at 5:54-60.

(Ex. 5, Lavian Rebuttal Rep. to Nielson ¶¶ 59, 61, 177-179).

## B. Opinions on the Contributions of the Fortinet Patents to CounterACT

In his opening report, Dr. Lavian opines that the inventions of the asserted Fortinet patents contribute significantly to Forescout's product, CounterACT. (Ex. 1, Lavian Infringement Rep. ¶¶ 338-344.) He starts by analyzing Forescout's marketed features for context. (*Id.* at ¶ 339.) He moves on to dividing Forescout into 31 distinct functions using a list of modules taken directly from Forescout's manual, plus the separately sold eyeExtend modules. He explained that:

> According to its administration guide, Forescout's CounterACT software is divided into three categories of modules: Base Modules, Content Modules, and Extended/eyeExtend Modules. FORESCOUT00000109 at 535. Base Modules enhance (and enable) CounterACT visibility, network connectivity, and control capabilities. *Id.* Content modules provide additional data for these base modules to use, with the base modules providing the functionality itself. *Id.* at 538. The four base modules are divided into plugins included with the software. *See id.* These plugins integrate with the base policy and visibility functionality of the CounterACT platform.

(*Id.* at ¶ 340). Based on this, he produced the following table:

|  | '299 Patent | '034 Patent | '421 Patent |
|---|---|---|---|
| **Authentication Module** | X |  |  |
| RADIUS | X |  |  |
| User Directory | X |  |  |
| **Core Extensions Module** | X |  |  |
| Advanced Tools | X |  |  |
| CEF Plugin |  |  |  |
| Device Classification Engine |  |  |  |
| DHCP Classifier Plugin |  |  |  |
| DNS Client Plugin |  |  |  |
| DNS Enforce Plugin |  |  |  |
| DNS Query Extension Plugin |  |  |  |
| External Classifier Plugin |  |  |  |
| Flow Analyzer |  |  |  |

| | '299 Patent | '034 Patent | '421 Patent |
|---|---|---|---|
| IOC Scanner Plugin | | | |
| IoT Posture Assessment Engine | | | |
| NBT Scanner Plugin | | | |
| Reports | | | |
| Syslog Plugin | | | |
| Technical Support | | | |
| NetFlow Plugin | | | |
| Web GUI / Dashboard | | | |
| **Endpoint Module** | X | X | |
| HPS Inspection Engine | X | X | |
| OS X Plugin | | X | |
| Hardware Inventory Plugin | | | |
| Linux Plugin | | X | |
| Microsoft SMS SCCM Plugin | | | |
| **Hybrid Cloud Module** | | | |
| AWS | | | |
| VMWare NSX | | | |
| VMWare vSphere | | | |
| **Network Module** | X | | |
| Centralized Network Controller | | | |
| Switch | | | |
| Wireless | | | |
| VPN | X | | |
| **eyeExtend Integration Modules** | | | X |

(*Id.* at ¶ 342 (citing Mot. Ex. F (Dkt. 280-7), FORESCOUT00000109 at 535-38).)  From here, Dr. Lavian explained that he analyzed the specific contribution made by the asserted patents to each of the modules:

> Further, in the below table, I describe the way in which the inventions of the Asserted Patents enhance the functionality of the CounterACT appliance, and score the significance of that contribution in five levels: very low, low, medium, high, and very high. This reflects my opinion as to the extent to which the contribution of the invention enhances the plugins in the above chart. I describe in detail the contribution of the invention, and any factors against which that contribution is weighed to contribute to that score.

(*Id.* at ¶ 344.)  And he then produced another table explaining in detail each score assigned to each of the above categories, not reproduced here for brevity, as this aspect of his analysis is not challenged in the instant motion. (*Id.*)

## C.    Opinions in Response to Dr. Cole's Apportionment for the Forescout Patents

In his opening report, Dr. Cole opined that the Forescout patents accounted for the majority of the value of Forescout's accused FortiNAC product.  (Ex. 3, Cole Rep. ¶¶ 117-127). He divided the product up into six categories of features: (a) Policy Life-cycle Management; (b) Profiling and

Visibility; (c) Guest Networking Access; (d) Security Posture Check; (e) Incidence Response; and (f) Bi-directional integration, and assigned them weights based upon their importance. (*Id.*)  In his rebuttal report on non-infringement, Dr. Lavian responded to Dr. Cole's apportionment analysis. (Ex. 4, Lavian Rebuttal Rep. to Cole ¶¶ 63-70.)  He applied Dr. Cole's own division of features, but critiqued Dr. Cole's method of assigning the patented inventions to the categories of features as arbitrary and resulting in significant double-counting. (*Id.*)  Dr. Lavian explained:

> Even taking Dr. Cole's initial categories and percentage assignments, I would approach the process differently. Instead, I would assign a value of contribution to each of the categories from a scale of categories: Minimal (5%), Low (10%), Medium (20%), High (40%), Very High (80%), and Complete (100%). I assign these scores to reflect the contribution of the accused functionality overall to the broad categories identified by Dr. Cole and existent in the products, and intend to reflect that these categories of features are each substantial.

> \*          \*          \*

> For each patent, I have assigned the above values based upon my experience, technical expertise, and my review of the evidence, explained below:

> – For the '004 Patent, the accused functionality makes a minimal contribution to incidence response, because the logging feature could enable more effective responsiveness to network incidents by administrators;

> – For the '079 Patent, the accused functionality makes a low contribution to security posture checking, as the quarantine-then-allow functionality allows for more flexible scanning of devices, but is contrasted against other methods of limiting network access (*e.g.,* allow-then-scan, scan-then-allow, *etc.*), and a minimal contribution to both policy management and bi-directional integration, as it leverages these features in its implementation;

> – The accused functionality relating to the architecture in the claims of the '004 and '079 Patents also contributes to visibility, although given the conventionality of this architecture, and the fact that the majority of FortiNAC's overall architecture is inherited from Bradford Network's Campus Manager and therefore pre-dates the patents, I assign them a minimal value as this contribution is not incredibly substantial;

> – For the '764 Patent, I assign the same values as the '079, except for the profiling and visibility features because the claims do not recite the same architecture as the '004 and '079 Patents that contributes to visibility. It instead relates to authentication and

control, reflected in security posture and bi-directional integration, rather than visibility by substituting scanning for certificate authentication;

– For the '116 Patent, the accused functionality makes a low contribution to the profiling and visibility features, as profiling from the specific multiple sources of the claims provides one additional way of profiling devices in the already-mature profiling functionality; and

– For the '278 Patent, the accused functionality makes a low contribution to the policy life-cycle management features, as the applications of policies based on classification provides extra flexibility in the already-mature policy functionality, and minimal contribution to the security posture check as these policies may be used for security posture checking; I do not assign it a score for profiling and visibility because, although the claim language mentions classification, the claims are directed towards using that classification in policy, not making the classification in the first place.

(*Id.* ¶¶ 67-68.) Dr. Lavian explained that his approach of starting by addressing the contribution of the accused functionality avoids double counting and ensures that the relative contribution of each patent to the claimed features is accounted for and addressed in any calculations. (*Id.* at ¶ 70.)

### D.  Opinions on Alternative NAC Products

In his rebuttal report on non-infringement of the Forescout patents, Dr. Lavian also opined as to the existence of other products on the market, in particular relying upon the opinion of Forescout's damages expert, Dr. Rao, as to the presence of non-infringing alternatives. (Ex. 4, Lavian Rebuttal Rep. to Cole ¶¶ 61-62.) In his report, Dr. Lavian explained:

In addition to the above design-arounds for the '004 and '079 Patents, acceptable non-infringing alternatives exist with respect to each of the Forescout Patents. For example, Fortigate's basic network access control functionality exists and is not accused of infringement in this litigation. Similarly, many other NAC products exist on the market with and without similar features. Moreover, Forescout's own expert, Dr. Mohan Rao, opined that these non-infringing NAC solutions would capture some FortiNAC sales in the absence of FortiNAC:

> To determine the proportion of sales that Forescout would have captured from Fortinet, I account for the fact that in the but-for world, non-infringing NAC solutions from vendors like Cisco and Aruba would capture some portion of FortiNAC sales. Rao Report, ¶ 57

Indeed, the small features identified are not required for NAC, and as discussed above, the '004 and '079 Patents are not nearly as foundational as Dr. Cole contends. Even the features themselves may be implemented in non-infringing ways. In addition to

the design-arounds above, the '764 Patent can be designed around using the prior art 802.1x standard, which in even supports a mode similar to the quarantine-then-verify method of the patent. *See* '764 Patent at 2:6-10; IEEE 802.1x, at 121 (noting that 802.1x bridges may support VLAN assignments for allowing limited access prior to authentication based on the 802.1x standard). The '116 Patent can be designed around by relying upon the myriad of other, often more modern, ways of classifying devices. With the claims requiring an agent, Forescout itself touts its ability to *not* practice the '116 Patent with its agentless functionality. And, the '278 Patent can be designed around by practicing prior art methods as well, which disclose the idea of policies applied to different devices based upon information from them, or by classifying devices based on methods other than traffic analysis and applying compliance rules based on those classifications.

(*Id.*) Fortinet's damages expert, Dr. Ugone considered these opinions to provide context for a hypothetical negotiation. (Ex. 7, Ugone Rebuttal Rep. ¶¶ 126-131, 168-170.)

## III.  LEGAL STANDARD

Under Federal Rule of Evidence 702, an expert witness may provide opinion testimony "if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."  The Court's role is one of "a gatekeeper, not a fact finder" (*Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010)), and thus screens the jury from "unreliable nonsense opinions," without excluding opinions "merely because they are impeachable."  *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). "Rule 702 should be applied with a 'liberal thrust' favoring admission."  *Chavez v. S.F. Bay Area Rapid Transit Dist.*, No. C 22-06119, 2024 U.S. Dist. LEXIS 110219, at *7-8 (N.D. Cal. June 21, 2024) (quoting *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014)).

## IV.  ARGUMENT

### A.  Dr. Lavian expressly applied the Court's construction of "RAD-agnostic."

Despite Forescout's liberal reliance on misstatements, omissions and assumptions, the record is clear that Dr. Lavian explicitly applied the Court's construction of the term "RAD-agnostic" in his report.  In asking to strike his application of that construction, Forescout cites exactly one case on

the issue: *Treehouse Avatar LLC v. Valve Corp.*, 54 F.4th 709 (Fed. Cir. 2022). There, an expert expressly applied an overbroad and materially different plain and ordinary construction of a term that had already been construed. *Id.* at 715. The expert in *Treehouse* plainly ignored the court's construction. *Id.* Here, by contrast, Dr. Lavian *explicitly* quotes, analyzes, and applies the Court's construction. (Ex. 1, Lavian Infringement Rep. ¶¶ 27, 139, 140, 145.) As discussed below, Dr. Lavian's approach is nothing like that of the expert in *Treehouse*, and indeed it is Dr. Nielson and Forescout that have departed from the Court's construction.

<u>First</u>, in his report, Dr. Lavian recites the Court's construction, noting that it "requires only that the system be unaffected by the manufacturer of the RAD," and repeats the Court's description of this construction as being "consistent with a multi-vendor solution." (Ex. 5, Lavian Rebuttal Rep. to Nielson ¶ 59; Dkt. 174 (Claim Construction Order) at 45 (noting that its construction is "consistent with the specification's characterization of a RAD-agnostic embodiment as a 'multi-vendor solution'"); Ex. 1, Lavian Infringement Rep. ¶¶ 27, 139, 140, 145) Forescout argues that this language, <u>*directly from the Court's order*</u> is an "admission" that Dr. Lavian is applying a different construction. (Mot. at 4.) It, clearly, is not. He is not applying "his legal view," as Forescout suggests. (Mot. at 4.) He is applying the Court's legal view. Indeed, that Dr. Lavian reiterated language from the Court's order describing its construction in his detailed analysis is in fact proof that he did apply the Court's construction.

<u>Second</u>, Forescout attempts to twist Dr. Lavian's words to imply that he is opining that any product supporting multiple vendors is RAD-agnostic. (Mot. at 4.) He is not. That CounterACT supports multiple vendors is only part of his opinion that CounterACT is unaffected by the manufacturer of the RAD. (*See* Ex. 1, Lavian Infringement Rep. ¶ 140 ("[t]he act of enforcement of policy by the CounterACT appliance is achieved independent from the vendor, with the system being unaffected by the manufacturer of the [RAD]", ¶ 141 ("First . . . [it] supports a variety of RADs"), ¶ 142 ("Second . . . the policy functionality breaks this down into a single . . . action . . . and unifies the format of information.").) Forescout cites what Dr. Lavian provided as evidence supporting his opinion as if it were his entire opinion, and applies similar snippets from his deposition transcript in the same way. (Mot. at 4.) Dr. Lavian never opines that supporting multiple vendors is the *only*

thing required for a device to be RAD-agnostic. Instead, he likens CounterACT to embodiments in the specification when applying the Court's construction, noting that these focus on supporting multiple vendors, and they do so via abstraction. (*See* Ex. 1, Lavian Infringement Rep. ¶ 140 (quoting '299 Pat. at 5:54-59).) He opines that CounterACT is unaffected by the manufacturer of the RAD, *id.* ¶ 140, and notes that it shares these two key aspects of the cited embodiments. (*Id* ¶ 141 ("First . . . "); ¶ 142 ("Second . . . ").) This is an application of the Court's construction, supported by a detailed analysis of the accused product, and Forescout presents at most a factual dispute over his application.

The embodiments with which Dr. Lavian compares CounterACT are also directly tied to the Court's construction. In his rebuttal report, he explains how the Court drew its construction from a section of the specification that defines the phrase "(vendor)-agnostic" as being "unaffected by the manufacturer." (Ex. 5, Lavian Rebuttal Rep. to Nielson ¶ 177 (citing Dkt. 174 at 42-45 (quoting '299 Pat. at 4:36)).) Then, he notes that the specification of the patent described an embodiment of the invention as vendor-agnostic—an application by the patentee of their own definition that was adopted by the Court. (*Id.* ¶ 179 (quoting '299 Pat. at 5:54-60).) This is the same embodiment he references in his opening report, where he compares it to CounterACT to determine that CounterACT is unaffected by the manufacturer of the RAD in the same way that the agnostic embodiment of the specification was. (Ex. 1, Lavian Infringement Rep. ¶¶ 140-144.)

In other words, the Court adopted the patentee's definition of the term, Dr. Lavian applied that definition, and in doing so he consulted the patentee's application of their definition, ensuring that he was applying it correctly.

Finally, while the application of Forescout's chosen interpretation of the term is not properly the subject of a *Daubert* motion, it must be discussed because Forescout's arguments assume that Dr. Nielson's analysis is correct and that Dr. Lavian's failure to agree renders his opinions unreliable.[2]

Dr. Lavian does not apply Dr. Nielson's absurd interpretation of the term, which requires the device to support *every* conceivable RAD – past, present and future. (Mot. at 5; *see also* Dkt. 286

---

[2] Fortinet discusses Dr. Nielson's construction itself in more detail in its opposition to Forescout's motion for summary judgment, filed concurrently herewith. *See* Opp. to Forescout's Summary Judgment Motion, at § III.C.

1   (Forescout Motion for Summary Judgment) at 4.)  In his response, Dr. Lavian politely explained that

2   his approach is "more nuanced" than Dr. Nielson's and analyzed the Court's order.  (Ex. 5, Lavian

3   Rebuttal Rep. to Nielson ¶ 59.)  Indeed, Dr. Nielson simply draws an extreme read of the word

4   "unaffected" to draw his conclusions.  (Ex. 6, Nielson Rep. ¶ 1063 (concluding, *ipse dixit*, that the

5   claims "broadly apply to all possible RADs" and looking for evidence of support for every possible

6   RAD).)  In fact, Dr. Nielson's application is so extreme that he also argues that it wholly excludes

7   every embodiment in the patent (an enablement challenge) and the inventor's own implementation

8   of the patented invention (a priority date challenge).  (Ex. 6, Nielson Rep. ¶¶ 137-167, 1034-1065.)

9   Had Forescout argued for this read at claim construction, it still would have contradicted Federal

10  Circuit precedent, as the court has "frequently stated" that "a construction that would not read on the

11  preferred embodiment would rarely if ever be correct and would require highly persuasive

12  evidentiary support."  *Chimie v. PPG Indus. Inc.,* 402 F.3d 1371, 1377 (Fed. Cir. 2005) (cited in

13  Mot. at 4) (cleaned up).  In any event, it is too late for Forescout to argue for such a construction.

14       Here, Forescout's arguments take Dr. Nielson's extremist construction as gospel, and suggest

15  that Dr. Lavian's choice to stick to the Court's ruling warrants exclusion.  For example, Forescout

16  cites a snippet from Dr. Lavian's deposition to suggest that he "conceded" that abstraction does not

17  allow a device to support every possible RAD.  (Mot at 5.)  On top of assuming that Dr. Nielson's

18  take on the term is a given, this ignores Dr. Lavian's analysis by separating out his "abstraction" point

19  as though it were a standalone argument and not part of a broader analysis.  As discussed above, the

20  patent describes a "vendor-agnostic" embodiment in part as being implemented using abstraction,

21  which Dr. Lavian examines as part of his analysis to note its similarity to CounterACT.  (Ex. 1,

22  Lavian Infringement Rep. ¶ 140 (citing '299 Pat. at 5:54-59).)  He does not argue that abstraction is

23  "magic," as Dr. Nielson derisively suggests, although it may be correct to suggest that magic is what

24  is necessary to satisfy Dr. Nielson's absurd construction of the term.  (Ex. 6, Nielson Rep. ¶ 1038.)

25       Forescout's argument is not a *Daubert* argument.  It is at best a non-infringement argument,

26  and at worst an argument for an entirely new construction of the term.  It is based on misstatements,

27  omissions, and assumptions.  The Court can determine if there is a factual dispute at summary

28

judgment, and a jury can decide if Dr. Lavian's application of the Court's construction is persuasive. Dr. Lavian expressly applied the Court's construction, and his analysis is sound.

**B.      Dr. Lavian's opinions on the contribution of Fortinet's patents to CounterACT are the product of reliable methods.**

Dr. Lavian offers a detailed opinion, in the role of a technical advisor to Fortinet's damages expert, as to the contribution of Fortinet's patented inventions to CounterACT. (Ex. 1, Lavian Infringement Rep. ¶¶ 338-344; Ex. 2, Ugone Rep.) Dr. Lavian analyzes Forescout's marketing and technical material, and he uses *Forescout's own division of CounterACT* into 31 distinct modules. (Ex. 1, Lavian Infringement Rep. ¶ 342.) From there, he measures the contribution of the patented invention to each of these features, describing his reasoning in detail. *Id.* ¶ 344. Dr. Ugone relies on this opinion as input to a hypothetical negotiation, although he applies additional apportionment principles, including the baked-in apportionment of a comparable agreement. (Ex. 2, Ugone Rep.) Forescout describes Dr. Lavian's detailed process as "entirely arbitrary" by cherry-picking from his deposition and ignoring the analysis in his report. (Mot. at 6.) It is mistaken.

First, Forescout argues that Dr. Lavian's list of thirty-one "base modules," taken directly from Forescout's manual, is an "entirely arbitrary" starting point. (Mot. at 7; Ex. 1, Lavian Infringement Rep. ¶ 342 (citing Mot. Ex. F (Dkt. 280-7), FORESCOUT00000109 at FORESCOUT00000535-38).) Forescout does not explain what is arbitrary about its own base modules, nor does it cite any case law for this point. (Mot. at 7.) Instead, it plucks from the manual a list of six non-functional "content" modules. (*Id.* at 7-8.) Dr. Lavian's report, however, explains that these "[c]ontent modules provide additional data for these base modules to use, with the base modules providing the functionality itself." (Ex. 1, Lavian Infringement Rep. ¶ 340.) In other words, they don't themselves do anything. Forescout ignores this. Indeed, Dr. Lavian's cited documentation confirms the statement in his report, explaining that while the base modules relate to the product's "visibility, network connectivity, detection and control capabilities," the content modules contain underlying data used by the actual functional modules of the product. (Mot. Ex. F (Dkt. 280-7), FORESCOUT00000109 at FORESCOUT00000535, 538.) The documentation states:

> Content Modules deliver **data that is used by other Modules** for classification, inspection and control. For example the Windows Applications Module delivers host properties and actions used by the HPS Inspection Engine to support in-depth discovery and management of software and applications on Windows endpoints.

(*Id.* at FORESCOUT00000538 (emphasis added).) In Forescout's example shown above from its documentation, one content module provides data used by the "HPS Inspection Engine," one of the functional modules that Dr. Lavian had already counted. (*Id.*; Ex. 1, Lavian Infringement Rep. ¶ 342.) To include both the functional HPS Inspection Engine modules and the content module providing the underlying data would be to double-count this functionality of the product, as his apportionment already takes the HPS Inspection Engine into account. Dr. Lavian properly considered the functional modules, considered whether the content modules were relevant to apportionment, and correctly concluded that they are not. (*Id.*) Forescout is of course welcome to present its argument that CounterACT should be apportioned differently at trial and test Dr. Lavian's sound analysis through cross-examination.

Second, Forescout takes issue with Dr. Lavian's analysis as to its eyeExtend/Extended modules. (Mot. at 8.) Forescout argues that he "skip[ped] over the step of identifying which specific modules are implicated." (*Id.*) He did not. His report explains that he reviewed every eyeExtend module and found that each module was implicated, as they all share common accused functionality. (*See* Ex. 1, Lavian Infringement Rep. ¶¶ 309-311.) Forescout ignores this.

The eyeExtend modules provide the functionality that is accused of infringing the '421 Patent. (*Id.*) Each eyeExtend module provides integration between CounterACT and a specific third-party product. (*Id.* ¶ 309.) Dr. Lavian explained that he reviewed the materials for each eyeExtend module and found that "they all work in a common way," as the materials each "describe[ed] the same CounterACT features applied to different third-party products." (*Id.* ¶¶ 310-311.) He thus apportioned the identical accused functionality of the modules on the basis of this common functionality. (*Id.* ¶ 344 ("the invention of the '421 Patent contributes substantially to the

functionality of Forescout's eyeExtend plugins").)  Forescout ignores this in its motion.  This is not an arbitrary or unexplained apportionment analysis, as Forescout contends.[3]

      <u>Finally</u>, Forescout twists Dr. Lavian's deposition testimony to suggest that he had no reasons at all for his apportionment.  As discussed above, his report speaks for itself.  The report clearly explains that he did not apportion "something less than the whole of CounterACT."  (Mot. at 11.)  In the testimony cited by Forescout from his two-day deposition covering nine patents, Dr. Lavian expresses that he is unable to comment on the entirety of the 800 pages of Forescout's manual on the spot, which Forescout warps into an admission that "lacks any method at all."  (Mot. at 9-10.)  When he did later explain that he was "trying to find out of all of the features" that are relevant to his analysis from a technical perspective, Forescout again twists this into an admission that he somehow excluded "less relevant" features.  (*Id.* at 11.)  However, his analysis does not exclude anything, it includes every functional module of CounterACT listed in Forescout's manual.  (*See* Ex. 1, Lavian Infringement Rep. ¶ 342.)  As discussed above, the non-functional content modules are simply not relevant to an apportionment analysis, and the individual sold-separately eyeExtend modules each have identical overlapping functionally and are thus correctly considered as such.  (*Id.* at ¶340.)

      From here, Forescout cites case law that is plainly inapposite where experts presented bare legal conclusions or were in fact entirely unqualified.  *See Plush Lounge Las Vegas LLC v. Hotspur Resorts Nev. Inc.*, 371 F. App'x 719, 720 (9th Cir. 2010) (cited in Mot. at 10) (expert in an antitrust case did not explain their qualifications and only presented a conclusion without any factual support); *Zhu v. Li*, No. 19-CV-02534, 2023 WL 1111507, at *2 (N.D. Cal. Jan. 30, 2023) (cited in Mot. at 10) (report on corporate valuation contained "no statement of the relevant facts on which his report is based," did not explain any valuation methods considered or used, and made adjustments for factors including "etc."); *Innovative Memory Sys., Inc. v. Micron Tech., Inc.*, No. CV 14-1480, 2022

---

[3]    To the extent that Forescout is contending that Dr. Lavian should have included eyeExtend modules in his analysis of the base product, each module is individually sold separately and would not be properly included in the base analysis.  (*See* Mot. Ex. F (Dkt. 280-7), FORESCOUT00000109 at FORESCOUT00000539 (noting that extended modules "require valid licenses.").)  Dr. Ugone properly considered the sales of these modules separately in his analysis.  (*See* Ex. 2, Ugone Rep. ¶ 62, 64.)

WL 4548644, at *18 (D. Del. Sept. 29, 2022) (cited in Mot. at 10) (expert did not have the "scientific expertise to make an estimate about how many technical features are described on the product data sheet," and did not describe any methodology for counting them). Dr. Lavian has explained his qualifications and presented ample factual support, and has counted features on the basis of Forescout's own cataloguing of them in its manual.

Dr. Lavian correctly considered every component of CounterACT, and apportioned the whole of the product. His analysis is sound and should not be stricken.

## C.  Dr. Lavian's response to Dr. Cole's arbitrary apportionment calculation is the product of his application of reliable methods.

Dr. Lavian opined that the inventions of the Forescout patents are directed to individual features that make up a small part of Fortinet's NAC product, FortiNAC. (Ex. 4, Lavian Rebuttal Rep. to Cole ¶ 63.) He did so in response to an opinion by Forescout's Dr. Cole that the patents account for over half of the value of FortiNAC. (*Id.* ¶ 65.) Dr. Lavian criticized Dr. Cole's methodology, particularly Dr. Cole's decision to sum the total value of all categories implicated for a given patent and reduce that through an arbitrary series of reductions not tailored to each category. (*Id.*) In response, Dr. Lavian assumed "Dr. Cole's initial categories and percentage assignments," and apportioned from there by considering for each category the value of the contribution from each asserted patent. (*Id.* ¶¶ 67-68.) Dr. Lavian describes his analysis with respect to each patent and each category clearly, explaining what he is weighing, and what he is weighing against. (*Id.*) His response is based upon the application of reliable methods.

Forescout argues that Dr. Lavian "has no methodology" based on a statement he made at his deposition that a 5 percent number could be accurate to within plus or minus one percentage point. (Mot. at 12.) Not only does Forescout ignore the actual analysis of his report, which devotes time to each patent and each of Dr. Cole's identified features, but it wrongly implies that he must opine with mathematical certainty. That his opinion has error bars, and that he "accept[s] that apportionment like this cannot be an exact science," does not make his opinion unreliable. (Ex. 4, Lavian Rebuttal

Rep. to Cole ¶ 66.)[4]  The Federal Circuit has **also** "recognized that estimating a reasonable royalty is not an exact science." *Summit 6, LLC v. Samsung Elec. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015). Dr. Lavian's opinion is limited to providing the "technical understanding of a POSITA consulted by parties to a negotiation." (Ex. 4, Lavian Rebuttal Rep. to Cole ¶ 66.)  Moreover, these error bars are quite small, and they appear prior to his application of Dr. Cole's division of the product.  He has explained his reasoning in detail, and Forescout's motion ignores this detail entirely in favor of an argument contrary to the law *and* facts.

On top of this, Dr. Ugone correctly took Dr. Lavian's input as it was intended, as the input of a technical advisor.  Dr. Ugone's ultimate royalty rate considered many factors, including a comparable licensing agreement and was supported by the fact that this was in line with Dr. Lavian's input as to the contribution of the patents to FortiNAC.  (Ex. 2, Ugone Rep. ¶ 12-15.)  Had Dr. Lavian's opinions varied by plus or minus one point, it would not change the ultimate royalty rate in any event .

Dr. Lavian's opinions are sound, and the product of a reliable methodology.  They should not be struck because of the uncertainty inherent in the process of apportionment.

### D. Dr. Lavian's opinions that other NAC products exist and could serve as acceptable alternatives are the product of reliable methods.

Dr. Lavian opined that "[f]or example, Fortigate's basic network access control functionality exists and is not accused of infringement," and that "many other NAC products exist on the market with and without similar features."  (Ex. 4, Lavian Rebuttal Rep. to Cole ¶ 61.)  He then cited Forescout's own expert, Dr. Rao, who stated that "non-infringing NAC solutions from vendors like Cisco and Aruba would capture some portion of FortiNAC sales" were it not in the market.  (*Id.* (quoting Dr. Rao's report).)  Dr. Ugone, who relied upon Dr. Lavian's testimony in part of his analysis, also spoke with Fortinet's Peter Newton about Fortigate's basic network access control functionality in more detail.  (Ex. 7, Ugone Rebuttal Rep. ¶ 126.)

---

[4]   Forescout also ignores that its own expert recognized that his opinions reflect error bars.  (Ex. 8, Cole Tr. at 84:15-22 (acknowledging "maybe . . . a 5 percent differential").

Dr. Ugone relied upon Dr. Lavian's opinions primarily to make the point that Forescout's expert did not consider these alternatives, Ex. 7, Ugone Rebuttal Rep. ¶¶ 126-131, 168-170, and as context to define Fortinet's negotiating position with Forescout, *id.* ¶¶ 187, 199.  Dr. Ugone did not opine on lost profits under *Panduit*, which would have required a showing of non-infringing alternatives.  *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978).

Forescout takes issue with these statements, despite not actually contesting that these other NAC products exist, are on the market, and are not accused of infringement.  Its own expert recognized that Cisco and Aruba's products exist and have market share, as mentioned above, and Forescout was the one to introduce their existence into the case.  Forescout even deposed Fortinet's Mr. Newton and explored Fortigate's NAC functionality.  (Ex. 9, Newton Tr. at 26:20-33:25.)

In addition to all of this, Dr. Lavian noted at his deposition that he had reviewed a FortiGate manual.  (*See* Mot. at 13, n. 3 (citing Dkt. 280-6, Ex. E, Lavian Tr. at 307:5-308:22)).  This was inadvertently excluded from his 'materials considered' and was provided to counsel during his deposition upon request, to facilitate counsel's stated desire to question Dr. Lavian about the document. (Mot. at 13, n. 3; Dkt. 280-6, Ex. E, Lavian Tr. at 309:24-310:2 ("So if you can identify it to me now and get me the document today, I can ask him about it today.").)  Indeed, during the deposition, Forescout was provided with documentation that describes FortiOS, the software running on FortiGate products, and its NAC functionality. (Mot. at 13, n. 3.)  Forescout attached this documentation to its motion. (*See* Dkt. 280-9, Ex. H, at 17 ("Network access control (NAC) helps administrators implement policies…."; *id.* at 18 (showing the FortiGate appliance in a diagram); Dkt. 280-10, Ex. I (a printout from Fortinet's website, including the same quotes); Dkt. 280-8, Ex. G, at FORTINET0039194 (describing steps, including "[b]ring up a FortiGate…" and "[c]onfigure FortiOS NAC on the switch")).  Forescout asked for these documents at Dr. Lavian's deposition, received them, and had the opportunity to examine Dr. Lavian on them, but ultimately decided not to do so. *See*, e.g., *Elkins v. Pelayo*, No. 1:13-CV-1483, 2022 U.S. Dist. LEXIS 69648, at *60 (E.D. Cal. Apr. 14, 2022) (noting that Rule 26 "does not limit an expert's testimony simply to reading his report," that it "contemplates that the expert will supplement, elaborate upon, and explain his report

in his oral testimony," and that Rule 37 includes an exception for harmlessness, which "may be when an opinion and the bases therefor are disclosed through other discovery tools").

Moreover, Dr. Lavian's report also notes that a NAC product without the patented functionality would still be an acceptable alternative. He explains that "the small features identified [by Dr. Cole] are not required for NAC" and "the [asserted] patents are not nearly as foundational [to NAC] as Dr. Cole contends." (Ex. 4, Lavian Rebuttal Rep. to Cole ¶ 62.) In other words, that alternative NAC solutions would be acceptable, with or without the accused functionality, independently supports Dr. Ugone's opinion as to the parties' negotiating positions. Forescout ignores this analysis.

Forescout cites exactly one case (three times) in its briefing on this issue, and it is plainly off-point. (Mot. at 13 (citing *Snyder v. Bank of Am., N.A.*, No. 15-cv-04228, 2020 WL 6462400 at *10 (N.D. Cal. Nov. 3, 2020)).) In *Snyder*, an expert opining on the value of a property downwardly adjusted their estimate by an amount given to them by the plaintiff to represent work that needed to be done on the property, without independently verifying the numbers themselves or that the work was in fact necessary. 2020 WL 6462400 at *10. The court there also noted that the work had never been done, years after the fact. *Id.* Nothing like that has occurred here. The expert in *Snyder* blindly relied upon their client for questionable conclusions greatly impacting their ultimate opinion without studying them at all. *Id.* Here, Dr. Lavian expressly relied upon the admission of an opposing expert, who professed to have studied them, as to an uncontroversial fact.

Forescout does not seriously contend that FortiNAC and Forescout are the only two NAC products on the market. It attempts to smear Dr. Lavian for relying upon Forescout's own damages expert for the idea that other products exist on the market.

## V.    **CONCLUSION**

Dr. Lavian's opinions are the product of reliable methods and should not be stricken. He explicitly applied the Court's construction of "RAD-agnostic," and that Forescout disagrees with his application of this construction goes to the sufficiency and weight of the evidence, and is wholly improper in a *Daubert* motion. He provided a detailed explanation for his opinions as to the contribution of the asserted patents to both Fortinet's and Forescout's products. His opinions as to

non-infringing alternatives are backed up by facts. Dr. Lavian stands ready to defend the reliability of his opinions through live testimony on October 3, 2024 should the Court believe it would be helpful to resolving the disputed issues. Forescout's motion should be denied in its entirety.

Dated: July 25, 2024

DEBEVOISE & PLIMPTON LLP
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: _____ */s/ Douglas R. Nemec* _____
DOUGLAS R. NEMEC
*Attorneys for Plaintiff*
*Fortinet, Inc.*